UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION AT FRANKFORT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. |
| | ) | 3:08-cr-31-JMH |
| v. | ) | |
| | ) | |
| SHAUN MICHAEL SMITH, | ) | |
| | ) | **MEMORANDUM OPINION** |
| Defendant. | ) | |

** ** ** ** **

This matter is before the Court on Defendant Shaun Michael Smith's Motion to Withdraw his Plea of Guilty or, alternatively, Motion to Vacate his Guilty Plea [DE 524]. The United States of America filed a Response [DE 538], and Defendant Smith filed a Reply [DE 540] in further support of his Motion. The Court heard evidence and argument for and against the Motion during a hearing held on May 9, 2011. The Court, being adequately advised, denied the Motion at the conclusion of that hearing. This Memorandum Opinion is intended to memorialize the Court's decision.

I.    **Factual and Procedural Background**

Defendant Shaun Michael Smith was charged with multiple counts of mail and wire fraud, as well as conspiracy to commit mail and wire fraud, in an Indictment returned on December 11, 2008, along with co-Defendants Ray Garton, Michael D. Smith, Christopher Cello Smith, Mark Irwin, and Joshua Scott Harris. [DE 1.] All were charged with wrongdoing in connection with a scheme to defraud

investors by virtue of their involvement with a company called Target Oil and Gas.

On December 30, 2008, Shaun Michael Smith made his initial appearance in this matter before the Magistrate Judge, appearing with retained counsel, William A. Hayes. [DE 29.] That same day, Defendant Harris made his initial appearance before the Magistrate Judge, and Joe A. Jarrell was appointed to represent him in this matter. [DE 31 and 41.]

On September 3, 2009, Defendant Ray Garton appeared at a hearing on rearraignment, during which he entered a plea of guilty to Count 1 of the Indictment, which charged him with a violation of 18 U.S.C. § 1349, conspiracy to commit mail and wire fraud, pursuant to a Plea Agreement with the Government. [DE 147 and 149.] In the Plea Agreement, the United States agreed to certain conditions, including that it would move at Garton's sentencing to dismiss Counts 2 through 21, assuming his cooperation in the prosecution of this matter.[1]

Eventually, Mark Irwin entered into a Plea Agreement with the Government, in which he agreed to enter into a guilty plea to a one count Information, charging a violation of 18 U.S.C. § 371, conspiracy. [DE 170; *see also* Frankfort Criminal Action No. 10-cr-01-JMH, *generally*.] In the Plea Agreement, the United States agreed

---

[1]     Garton offered testimony as a witness for the United States at the trial in this matter from June 14 to June 17, 2010.

to certain conditions, including that it would make a motion at Irwin's sentencing to dismiss Counts 1 through 25 of the Indictment in the present action as to Irwin, assuming his cooperation in the prosecution of this matter.[2]

A jury trial commenced in this matter on June 8, 2010, as to co-Defendants Michael D. Smith, Christopher Cello Smith, Shaun Michael Smith, and Joshua Scott Harris. At the beginning of the eighth day of trial, June 17, 2010, Defendants Shaun Michael Smith and Joshua Scott Harris requested rearraignment. At that time, both Smith and Harris pleaded guilty to all counts of the Indictment with which they were charged, Counts 1 through 23, and each agreed with the facts contained in the forfeiture count, Count 26. [DE 271, 273.]

Smith was present in the Courtroom during the rearraignment of Harris and, when Smith stood before the Court, the Court inquired of him, "You have heard me tell Mr. Harris what those penalties are [as to the offense alleged in the Indictment] and what possibility you could be facing. Do you understand those penalties?" [Transcript of June 17, 2010, Rearraignment Hearing for Joshua Harris and Shaun Michael Smith (hereinafter, "Rearraignment Transcript"), p. 26.] Defendant responded, "Yes, sir." Defendant indicated that he had no questions about those penalties. [*Id.* at

---

[2]    Irwin offered testimony as a witness for the United States at the trial of this matter from June 9 to June 10, 2010.

p. 26.] He was advised that his sentence would "be determined using the Sentencing Guidelines as a framework for [the Court's] decision." When the Court commented that "that's what Mr. Hayes has told you, I am sure," Defendant again responded, "Yes, sir." The Court continued at length about the use of the Guidelines in sentencing and concluded, "I have no idea what your sentence is going to be because I haven't seen the presentence report. You understand that?" [*Id*. at p. 27.] Again, Defendant responded, "Yes, sir." [*Id*. at p. 27.] He also indicated that he understood that "if [his] sentence is more than [he] expected, [he will] still be bound by [his] plea and will have no right to withdraw it." [*Id*. at p. 28.]

When asked what he had done to make him guilty of the crimes charged in the indictment, he responded, "I mailed out the programs that Ray Garton had made us. And apparently they were false..." When the Court inquired if Defnedant knew they were false, he said, "I do now." [*Id*. at p. 30.] Notably, the Court, counsel, and Defendant Smith, among others, were privy to three days of testimony from Ray Garton just prior to Smith's guilty plea.

Assistant United States Attorney Frances Catron next explained to the Court that the United States could prove:

> . . . that he received money from investors
> and payment from checks and that he set up
> separate savings accounts in the names of
> these well programs to set up the appearance
that the investor money was being kept separate when in fact he
would deposit the investor checks into these savings accounts and

then almost immediately, within a day or two thereafter, withdraw that money from the savings accounts and redeposit it into his personal account or into accounts of Target Oil and Gas or other accounts, but the money was not maintained separately despite that appearance; [and] that he would mail out the geology books and investment contracts to potential investors. . .

[*Id.* at pp. 34-35.]

The United States indicated that it would also prove that Shaun Smith held a position of management within Target Oil and Gas, that he had knowledge of the sale of well programs because he kept the records for those programs, including sales commissions, and maintained the investor records, that he had knowledge of the cease and desist orders that revealed that Target Oil and Gas was selling securities without disclosure of all material facts to investors, that he knew that the wells of Target Oil and Gas were not developed properly and that permit violations were not being addressed, and that he knew sales were being made out of three locations.

The United States stated that it could also prove that Smith worked directly with Chris Holsapple, another Target Oil and Gas employee, "in the preparation of different materials to be mailed to investors like the brochures and the contracts" and that "the United States mails, Federal Express and UPS interstate carriers were routinely used to send and receive the brochures, the contracts and then to receive back the signed contracts and the signed investor checks and the signed checks for the completion fees. . ." [*Id.*] The United States also held out that it could

prove that Defendant Smith masqueraded as a satisfied Target investor in on-line groups and that he planned, with another individual, to plant drugs on a witness, Robert Briney, to discredit him.

Interestingly, when the United States presented its list of what it was prepared to prove at trial, Defendant Smith did not accept that list wholesale. Rather, Hayes stated on the record that Smith could "rebut a lot" of the items that the United States felt it could prove, but that Smith could not rebut "the issues of mailing on the packets and not on the banking issues." In other words, Smith agreed through his counsel [*Id.* at p. 35-36] and by his own statement [*Id.* at p. 36] that he believed that the United States could prove what it said it could with respect to the mailings that were made and banking transactions in which Smith participated. He did not accept the list wholesale.

After Shaun Michael Smith and Harris pleaded guilty, the trial in this matter continued for another twenty days, altogether, and the jury convicted co-Defendant Michael D. Smith on the charges contained in Counts 1 through 5, 10, 13, 15, and 17-20 of the Indictment. [DE 314 and 319.] Co-Defendant Christopher Cello Smith was convicted by the jury on the charges contained in Counts 3, 4, 5, 10, 13, and 15 of the Indictment.[3] [DE 320.]

---

[3] Defendant Christopher Cello Smith was also convicted of Count 17 by the jury. The Court, however, granted his Motion for Judgment of Acquittal on that count by its Memorandum Opinion and

Smith testified before this Court on May 9, 2011, that he started to have doubts about his decision to enter a guilty plea following a telephone conversation with Hayes which took place approximately one month after the trial in this matter concluded. During that conversation, according to Smith, Hayes first expressed his belief that Defendant Smith would likely receive a sentence of more than probation and similar to that which he anticipated Smith's co-Defendant Ray Garton would receive – six months of home incarceration and six months of time served in a "half-way" house. Smith then decided that he wanted new counsel sometime in September 2010 – approximately two-and-a-half months after entering his guilty plea.

Time passed, and, on February 15, 2011 (nearly eight months after Defendant Shaun Michael Smith's rearraignment), William A. Hayes moved to withdraw as counsel for Defendant Shaun Michael Smith [DE 440], explaining that he had been advised on February 4, 2011 (7 months and 19 days after Defendant Smith's rearraignment), that Defendant Smith no longer wished to retain him as counsel. Attorney David J. Guarnieri filed a Notice of Appearance on behalf of Defendant Smith on February 16, 2011 [DE 444]. Ultimately, the Court entered an agreed order substituting counsel and permitting Hayes to withdraw as counsel of record for Defendant Smith on February 22, 2011 [DE 455].

---

Order dated September 1, 2010 [DE 379].

More time passed.  Then, on April 29, 2011 (10 months and 13 days after Defendant Smith's rearraignment), Defendant Smith filed his Motion to Withdraw Guilty Plea or, Alternatively, Motion to Vacate Guilty Plea [DE 524].  The motion was fully briefed, and an evidentiary hearing held.   During the evidentiary hearing, Defendant Smith testified and called two witnesses: co-Defendant Joshua Scott Harris and Defendant Smith's wife, Tracy Gregory Smith.  The United States cross-examined each of Defendant Smith's witnesses then called Jarrell and Hayes as witnesses.  Jarrell and Hayes were cross-examined by counsel for Defendant Shaun Michael Harris.

## II.  Discussion

### A.    Motion to Withdraw Guilty Plea

Federal Rule of Criminal Procedure 11(d)(2)(B) allows a defendant to withdraw a guilty plea after its acceptance by the trial court and before sentencing if he "can show a fair and just reason for requesting the withdrawal."  Rule 11 allows "a hastily entered plea made with unsure heart and confused mind to be undone, not to allow a defendant to make a tactical decision to enter a plea, wait several weeks, and then obtain a withdrawal if he believes he made a bad choice in pleading guilty."  *United States v. Walden*, 625 F.3d 961, 965 (6th Cir. 2010) (*quoting United States v. Ellis*, 470 F.3d 275, 280-81 (6th Cir. 2006)) (other citation omitted).  Defendant Smith, as any movant, has the burden of

presenting proper grounds for granting the motion. *United States v. Bazzi*, 94 F.3d 1025, 1027 (6th Cir. 1996).

In determining whether to grant a motion to withdraw a guilty plea, the Court must consider:

> (1) the amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has had prior experience with the criminal justice system; and (7) potential prejudice to the government if the motion to withdraw is granted.

*United States v. Bashara*, 27 F.3d 1174, 1181 (6th Cir. 1994), superseded on other grounds as recognized in *United States v. Caseslorente*, 220 F.3d 727, 734 (6th Cir. 2000)). "These factors represent 'a general, non-exclusive list and no one factor is controlling.'" *United States v. Goddard*, __ F.3d __, 2011 WL 1119613, *4 (6th Cir. Mar. 11, 2011) (quoting *United States v. Bazzi*, 94 F.3d 1025, 1027 (6th Cir. 1996)).

Based on the argument, evidence presented, and the Court's review of the record in this matter, including the undersigned's recollection of the course of the trial in this matter, the Court concludes that every *Bashara* factor but two, Defendant Smith's background and experience with the criminal justice system, weigh

against allowing him to withdraw his plea. The Court reaches that conclusion for the reasons enunciated at the conclusion of the hearing and as set forth below.

### 1. Timing of Motion to Withdraw

The amount of time between Defendant Smith's guilty plea and the filing of the motion to withdraw — ten-and-a-half months — was excessive. Indeed, other courts in this Circuit have considered periods of time less than ten-and-a-half months to be excessive. *See, e.g., United States v. Cinnamon*, 112 F. App'x 415, 418 (6th Cir. 2004) (three months) (*citing United States v. Baez*, 87 F.3d 805, 808 (6th Cir. 1996) (eighty-seven days); *United States v. Goldberg*, 862 F.2d 101, 104 (6th Cir. 1988) (fifty-five days); and *United States v. Spencer*, 836 F.2d 236, 239 (6th Cir. 1987) (35 days)). Further, and as discussed below, Smith has offered no satisfactory explanation for this delay. This factor militates against Defendant Smith's position.

### 2. Failure to Withdraw Pleas Earlier

As an initial matter, the Court does not believe that Hayes promised Smith that he would be facing any more than a sentence of probation – or any particular sentence – for the reasons stated below. Nonetheless, if the Court did believe that Hayes made such a promise to Smith, there is no evidence that Smith ever asked Hayes to make a motion to permit him to withdraw his guilty plea at any time after he realized that he wanted to do so. Rather, Smith

has offered the explanation that he waited until he was able to acquire the financial resources to hire a new attorney – sometime in January 2011 – and then actually hired that new attorney, permitted him to get up to speed, and handle other matters, including a review of the PSR prepared by the United States Probation Office, before he made the motion.

For these reasons, Smith's case is distinguishable from the unpublished case of *United States v. McCoy*, 155 Fed. App'x 199 (6th Cir. 2005), on which he relies. In *McCoy*, the record was silent as to whether the defendant knowingly and voluntarily entered his guilty plea, i.e, there was no record that the defendant was advised of his rights and waived them as contemplated by Fed. R. Crim. P. 11(b)(2). More importantly, with respect to the immediate analysis, McCoy's counsel did not file a motion to withdraw his guilty plea when defendant requested it, instead filing a motion to withdraw. In other words, McCoy had to obtain new counsel in order to file his motion.

By contrast, in the instant matter, Smith was carefully advised of the eight items set forth in Rule 11, which the undersigned recalls well and which is, for others, preserved in the transcript of Smith's rearraignment. Further, there is no evidence that Defendant Smith ever asked or that Hayes ever declined to file the motion for Smith at any time during the eight months which passed between Defendant's rearraignment and Hayes' Motion to

Withdraw.[4]

Ultimately, Smith has provided no meaningful explanation for why he waited so long to request the relief he now seeks. In the absence of a credible explanation for the delay in filing his motion, this factor weighs against Smith in the Court's analysis.[5]

### 3. Assertion of Innocence

Defendant Smith claims that he has maintained his innocence throughout the case, but the record belies his assertion. At his rearraignment hearing, Smith asked this Court to adjudge him guilty, and the Court did not do so blindly. Before accepting his guilty plea, the Court worked at length to confirm that he understood the charges against him and to ascertain the voluntariness and the basis of his guilty plea. Smith assured the

---

[4] The Court has not yet been provided a copy of the PSR by the United States Probation Office, so the undersigned is unaware of either Smith's Guidelines Calculation or the recommended sentence. It is notable, however, that Smith waited until after he had reviewed the PSR prepared with respect to his case to make his motion. The Court intuits that it does not recommend a sentence of probation or 6 months home incarceration and 6 months in a half-way house.

[5] Defendant Smith also argues that he delayed the filing of his motion in order that he could ascertain the outcome of the prosecution of Mark Irwin for making a false statement. The Court will not evaluate this argument until it can resolve Smith's co-defendants Motions for a New Trial [DE 523, 528], which are pending before this Court and not yet fully briefed. For now, the Court will deny Smith's motions on the grounds set forth above, and the Court will reconsider this decision in light of his arguments concerning Mark Irwin's subsequent conviction for making a false statement at the same time that it considers the Motions for New Trial filed by Michael D. Smith and Christopher Cello Smith.

Court that he had read the Indictment on numerous occasions. Clearly, he knew with which crimes he was charged and to which charges he was pleading guilty. Further, under oath, he agreed with the factual predicate for the crimes set forth in that Indictment as articulated by Assistant United States Attorney Catron for the United States. He conceded that the government could prove that he participated in the mailings and banking transactions alleged and that his participation in those actions would support his guilty plea to the crimes charged in the indictment.

The Court has given careful consideration to Smith's argument that he never admitted that he had the appropriate *mens rea* to have committed the crimes. Specifically, he argues that he did not act with knowledge of any fraudulent misrepresentation in the materials that he was sending when he used of the mails. In support of this argument, Smith points out that, when asked what he had done "to warrant in [his] mind why [he was] guilty of the charges contained in [the] indictment," Smith responded that he "mailed out the programs that Ray Garton had made us. And apparently they were false, so I mailed them out." [Rearraignment Transcript at p. 30.] When the Court pressed Smith on whether he knew that the programs were false, he replied, "I do now . . . . [a]fter Mr. Garton's testimony." [*Id*. at p. 31.]

Certainly, there would be a questionable factual basis for a

guilty plea to the crimes charged in the Indictment based solely on the language in the isolated exchange cited by Smith. Smith, however, asks this Court to consider the language in a vacuum, which it will not do because that would place too much emphasis on that exchange in the face of everything else that took place in the time leading up to his guilty plea and what passed between Defendant and the Court during his rearraignment as a whole.

First, Smith was charged in Count I with conspiracy to commit mail and wire fraud. In other words, when he admitted that he was guilty of having conspired with others to commit mail and wire fraud, he was admitting responsibility for each and every instance of mail and wire fraud that was part of that conspiracy and, thus, also pleading guilty to the charges in Counts 2-22. He agreed that he had conspired with others to devise or intended to devise a scheme to defraud involving a use of the mails, which use was incident to an essential part of the scheme or a step in the plot, for the purpose of executing the scheme or attempting to do so. *Schmuck v. United States*, 489 U.S. 605, 711 and 715 (1989); *United States v. Frost*, 125 F.3d 346, 354 (6th Cir. 1997)*.* In other words, Smith was capable of conspiring in the fraud alleged whether or not he knew that Garton's brochures contained false information at the time they were mailed so long as he and his co-conspirator or co-conspirators intended to defraud investors and the use of the mails and wires to send those brochures or other items (whether the

mailings or items wired contained material mistatements or not) was reasonably foreseeable and incident to an essential part of their scheme or a step in the plot. *Pinkerton v. United States*, 328 U.S. 640, 646-47 (1946). Clearly, Smith foresaw the use of the mails in this matter for he participated in the mailings. Further, in order to plead guilty, he had to admit that the United States could prove that he had knowledge of the scheme to defraud investors. Finally, he has not suggested nor would the Court believe that such mailings or wire transmissions would not have been incident to or an essential part of the scheme.

Additionally, the Court has considered his words in light of the fact that Defendant Smith pleaded guilty after seven days of trial and having heard the testimony of five witnesses, including Ray Garton. In the first seven days of trial, the jury heard testimony from Target employee Mark Irwin, who described how Target employees used lead sheets and scripts to sell their product to investors, as well as how the salesmen were to watch the film *Boiler Room* and encouraged to emulate the sales "techniques" exhibited in that fictional account of an investment scheme. During Irwin's testimony, the United States introduced a recording of conversations between Irwin and a potential "investor" – Texas State Securities Board investigator Balde Quintanilla – in which Irwin and another Target employee, Ray Neal, pitched investment in Target wells. The United States also introduced sales commission

receipts signed by Shaun Smith and a memorandum to Target which bore Shaun Smith's handwriting. Witness Robert Briney offered testimony about drilling for Target and the payments he received. Quintanilla then offered testimony about the statements made to him while he posed as a potential investor. Vincent Guerreri, an actual investor, testified that he invested $40,000 in multiple well programs after sales calls from Chris Smith and sending and receiving items in the mail but that he received a return of less than $2,000 – notwithstanding the fact that Chris Smith enthusiastically represented to him that the wells were producing or would produce during their conversations.

The fifth witness, co-defendant and geologist Ray Garton explained how Defendant's father, Michael D. Smith, asked him stop doing field work with respect to specific potential well sites and to prepare a "general report" which could be sent to investors for any number of well sites. He described how he prepared reports intended for Target investors which indicated that wells would be placed on natural fractures even though no natural fracturing mapping was provided to surveyors for use in placement of the wells. Garton even testified that he was paid for the creation of at least two books related to the well programs known as Bell #2 and Bell #3, even though he did not prepare them. He wrote "completion" letters at the conclusion of drilling projects for Michael Smith, as well, but he never once recommended that a well

be completed.

In other words, a great deal of specific evidence was presented in the seven days before the rearraignment. It would come as no surprise to this Court that Smith learned for the first time some of the precise details of what went on during the scheme to defraud during the presentation of evidence by the United States during that time. Smith did not need, however, to be aware of all of the details at the time the crimes were committed to be culpable for it. It was enough that he was aware of the scheme and had the intent to mislead the investors as set forth elsewhere in this opinion.

That said, the Court agrees with Defendant that the United State's assertion that Smith "knew he was going to be convicted" is disingenuous for there has been no evidence adduced of his feelings on that issue, other than his late-breaking assertions of innocence. However, simply because Smith did not acknowledge or predict a possible conviction in the same way as in an *Alford* plea, which Smith argues, it does not mean that he did not agree that there was a sufficient factual basis for his guilty plea. In fact, this Court demanded it before permitting him to enter his plea. At the time, the Court was satisfied that Defendant believed that the United States could produce the evidence that it said it would to demonstrate the charges set forth in the indictment, charges which included his intent to defraud investors in concert with other

actors, e.g., co-conspirators, and demonstrate (1) that Shaun Smith, himself, participated in mailings that had taken place and which were part of a scheme to defraud investors with respect to the product that Target was offering and (2) that Smith participated in creating banking arrangements, i.e., establishing accounts and transferring funds, which would permit monies invested as to certain wells for other uses not associated with the development of those wells – another part of the scheme.  The Court remains convinced that he admitted guilt in adequate terms and did not maintain his innocence as he now argues.

Accordingly, this factor weighs against Smith in the Court's analysis.

### 4.    Circumstances Surrounding Guilty Pleas

Smith argues that he should be able to withdraw his guilty plea because he had been promised, at the time that he entered it, that he was going to receive a sentence of probation. Specifically, he argues in his Motion that his attorney, Hayes, told him that, if he entered a guilty plea, he could expect to serve no time.   However, the Court finds Defendant Smith's assertion that he entered a guilty plea because he believed he was being promised or assured a sentence of probation – or any sentence in particular, for that matter – to be incredible.

No one disputes that, when advising his client on whether to change his plea to guilty, Hayes told Smith on several occasions

that he believed that his client would receive a more lenient sentence if pleaded guilty. Hayes advised him that he would do better at sentencing if accepted responsibility for his actions than if he was convicted by a jury, particularly considering his relative lack of culpability with respect to the Target Oil scheme when compared with most of his co-defendants. By simply doing so, Hayes made no promise or assurance of what would happen. Nor did he make a promise when he expressed the opinion that Smith could "do better than the Guidelines," considering Smith's lack of a prior criminal history and good work history. Such a statement does nothing more than take into account the advisory nature of the Guidelines themselves and the Court's obligation to assign an appropriate sentence considering all of the circumstances, even varying from the Guidelines.

The Court does not believe that Hayes made a promise of any particular sentence to Smith prior to the entry of Smith's guilty plea. Certainly, Hayes has testified that he did not. But this is not a he-said-he-said situation because other witnesses were present when Hayes advised his client. Jarrell, who was present during the meetings between Hayes and Smith, testified that no promise was made. Jarrell's client, Harris, did not testify that any promise had been made in his presence, either. Rather, he testified that Hayes did not believe that Smith would be locked up. Only at another time, outside the presence of their attorneys, did

Smith tell Harris that Smith believed he had been assured a lenient sentence along the lines of what Garton anticipated.

With respect to Smith's belief that he had been assured of a lenient sentence similar to that anticipated for Garton, Jarrell explained that there was no discussion of Garton's potential sentence with Harris and Smith prior to sentencing. The Court gives credence to his testimony in light of the detail with which Jarrell recounted that it was he – not Hayes – who fielded the co-defendants inquiries about leniency that morning. Specifically, he described Harris' inquiry the morning of rearraignment into whether he and Smith could expect as lenient of a sentence as anticipated by Irwin (not Garton), i.e., probation. Jarrell dismissed that possibility as highly unlikely in the absence of some recommendation from the government and remarked on Harris and Smith's lack of cooperation with the government during the litigation when compared with Irwin's cooperation.

In comparison with the specificity with which Jarrell described that meeting and the advice provided, Tracy Gregory's testimony was less assured and, the Court concludes, less credible. Although she testified that she believed her husband had been promised a sentence of probation, she felt that because she recalled that Hayes told them on the morning of rearraignment that Smith "would get" a sentence "at worst" of 6 months home incarceration and 6 months in a half-way house. She seemed less

sure about her statement upon questioning by the Court, admitting that she did not know whether such a sentence would be "probation" or not. Further, she offered no recollection of the conversation described in detail by Jarrell about the possibility of a sentence of probation, leading the Court to conclude that her memory of that meeting was not as clear or complete as that of others who testified.

To the extent that Smith and his wife felt reassured or relieved by Hayes' statements concerning the potential for a more lenient sentence for Smith, that does not transform Hayes' remarks into a promise. Even Smith has identified no statement by Hayes which was, by its own terms a promise, testifying only that he believed that he had been promised a lenient sentence because it was "intimated" through what Hayes said about what might come to pass. Even if Smith (and his wife, for that matter) believed that Smith *could* not receive a sentence greater than probation, based on Hayes' analysis of the situation, Smith still has not demonstrated that Hayes actually made a promise or assurance which could be understood as a promise to him.

Further, this Court carefully explained to Smith during the rearraignment that the Guidelines would apply in his case and that his potential sentence could only be evaluated once the PSR was prepared and Guidelines calculation completed for the Court's review. The Court explained the advisory nature of the Guidelines,

which was in keeping with the advice provided by Hayes and Jarrell
to their clients because the Court recognized the fact that it had
some discretion to order a more lenient or a harsher sentence than
available under the Guidelines when the circumstances merit it.  In
other words, as Hayes described to his client, his client's wife,
and Harris, the Court does "not have to lock him up" if that is the
sentence called for in this instance, when all factors are
considered.

Smith swore to the Court during his rearraignment proceeding
that he had been promised nothing other than the application of the
Guidelines.  Defendant had several opportunities to speak to any
assurances or promises made, but he repeatedly assured the Court of
his understanding and that he had not been promised anything other
than that his sentence would be calculated with the reference to
the Guidelines.  Of course, Defendant Smith argues that he only
agreed that the Guidelines were the only "promise" that had been
made to him because he felt he was required to say it in order to
get the lenient sentence that he wanted, parroting Joshua Harris,
who had gone before him.

In making this assertion, he stated that it was clear to him
that it was what he had to do since the Court had cut Joshua Harris
off during this exchange:

> The Court:     Has Mr. Jarrell predicted what
>                your sentence will be?
>
> Harris:        Not – well –

| | |
|---|---|
| The Court: | I mean, he – he's told you about the guidelines – |
| Harris: | Yes. |
| The Court: | – and what the guidelines might be in your particular case. |
| Harris: | Yes. |
| The Court: | Okay, but that's the only – that's the only promise that has been made to you. |
| Harris: | Yes. |

[Rearraignment Transcript at p. 7-8.]

Defendant Smith would have this Court believe that he honestly thought he was the recipient of a "deal" which required him to enter a plea with his fingers crossed behind his back. In the first instance, no such "deal" with the Court ever existed nor has he offered credible proof that he was told that it did. Rather, he has identified statements by his counsel and the undersigned which reflect an awareness of the advisory nature of the Guidelines.

Further, isolating Harris' rearraignment statement about Jarrell's predictions under the Guidelines and asking the Court to interpret it as Smith proposes, would require the Court to ignore the fact that Smith was present for the entire rearraignment exchange between Harris and the Court. This includes the portion of the proceeding which directly preceded the exchange identified and in which the Court explained to Harris that it would make a determination of the applicable Guideline range and impose a

sentence considering the factors set forth in 18 U.S.C. § 3553(a).
The Court was free to clarify its question to Harris when it asked
him about Jarrell's advice to him with reference to the Guidelines,
and Smith's assertion that he took that clarification for something
else is entirely unreasonable and – for that matter – incredible in
light of everything that was said by the Court and the parties on
that morning.

　　The Court does not believe that Defendant Smith felt at the
time of his rearraignment that he had to say something in
particular in order to obtain a better sentence that he had been
promised.  Rather, to the extent that Smith was using the language
that he had seen Harris use before, the Court believes that – at
the time – he chose to do so because his experience in courtrooms
as a defendant in criminal matters was lacking.  The Court clearly
explained to both of these young men that their sentences would be
determined with reference to the Guidelines, taken as advisory, and
nothing more.  There is no evidence that anyone made Smith a
promise about his sentence - a promise that could not be kept.  At
best, he unreasonably interpreted the statements made by Hayes to
receive the news that he wanted to receive – that he was assured a
lenient sentence.

　　Nor does the Court find it incongruous that Smith would reject
offers which might have provided him the benefit of a certain
recommendation – 2 or 3 or 8 years were all mentioned during the

hearing as having been offered by the government – as opposed to the gamble that he now considers his decision to enter a plea to the indictment without an agreement with the government. He flatly rejected the offers of a plea agreement because he felt that the United States would require too much incarceration time of him in their recommendation. He and Hayes reasoned that he might receive a lesser sentence than those offered – none of which were on the table at the time he entered his Guilty plea – or than that which might be imposed if he was convicted at trial and did not accept responsibility, if he pleaded guilty. Effectively, they intended to rely on his acceptance of responsibility, his prior clean criminal record, and his good work history, to obtain mercy from the court, no matter what the Guidelines recommended. The Court contrasts this with the reason that Defendant has now set forth for seeking to withdraw his plea – the fact that the information set out in the PSR, which the Court has not seen to date, makes it clear to him that entering into a plea was not "in his best interest." In other words, Smith has lost faith in the plan that he and Hayes had at the time of his rearraignment. Yet, Smith's change of heart does not mean that he engaged in "a hastily entered plea made with unsure heart and confused mind" on June 17, 2010.

Ultimately, the Court finds Defendant Smith's assertion that he entered a guilty plea because he believed he was being promised or assured a sentence of probation – or any sentence in particular

at all, for that matter – to be incredible.  This factor weighs against Smith in the Court's analysis.

### 5. Defendant Smith's Nature and Background and Experience with the Criminal Justice System

Defendant Smith was twenty-eight years old at the time he entered his guilty plea in June 2010 and had earned a bachelor of arts degree in history.  His only experience with the legal field or the criminal justice system at the time he entered his guilty plea was as a defendant in the present case.  It follows that the Court would not expect a man of such limited experience with the criminal justice system to have detailed knowledge of what would happen during the rearraignment proceedings or what would be asked of him during that hearing save what he had witnessed during Josh Harris' rearraignment and what had been explained to him by his attorney prior to that hearing.

That said, Defendant Smith is a man of some intelligence, a college graduate, and young enough but nearing the ripe old age of thirty.  During his appearance before the Court for rearraignment, he presented himself in a competent and fairly confident fashion. He addressed the Court cogently and had, by all appearances, an understanding of the proceedings.  Further, during the course of his rearraignment, the Court asked him straightforward questions, and Defendant Smith answered the questions readily and without any apparent confusion or difficulty.  In other words, while his lack of experience with the criminal justice system weighs in his favor

with respect to this analysis, his background as a well-educated man of apparent intelligence, capable of understanding the proceedings, weighs against him.

### 6. Prejudice to the Government

More than ten months have passed since the conclusion of this trial which was, with respect to two of Shaun Michael Smith's co-Defendants, Michael D. Smith and Christopher Cello Smith, tried to the bitter end. At least on its face, the prejudice to the government would be clear. Witnesses' memories will have faded, some may be unavailable, and the sheer cost of recreating a trial of this magnitude in manpower and expenses would likely be large. Nonetheless, "the government is not required to establish prejudice that would result from a plea withdrawal, unless and until the defendant advances and establishes a fair and just reason for allowing the withdrawal." *Goddard*, __ F.3d __, 2011 WL 1119613 at *5 *(quoting United States v. Spencer*, 836 F.2d 236, 240 (6th Cir. 1987)). Since Shaun Michael Smith failed to establish such a reason, this factor is technically immaterial to the analysis, and, ultimately, the Court does not reach it. *Id*.

That said, Smith has argued that, absent prejudice, he should be allowed to withdraw his plea as a matter of course, citing *United States v. Savage*, 561 F.2d 554, 557 (4th Cir. 1972). That is no longer good law, in light of intervening amendments to Rule 32.

### B. Motion to Vacate

Smith also argues that the Court must vacate his guilty plea in light of Fed. R. Crim. P. 11(b)(3) as there was no adequate factual basis for the plea, i.e., no factually sufficient admissions to constitute the crime alleged in the indictment. The Court agrees with Defendant Smith that, the Advisory Committee notes to Rule 11 make it clear that the "normal consequences of a determination that there is not a factual basis for the plea would be for the court to set aside the plea and enter a plea of not guilty." Fed. R. Crim. P. 11(b)(3), advisory committee notes (1966). He relies on *United States v. Mastrapa*, 509 F.3d 652 (4th Cir. 2007), in which a defendant's guilty plea was vacated because it was not supported by sufficient facts where the defendant did not admit the necessary *mens rea*, i.e., the defendant did not admit that he had knowledge that the bag he was carrying contained methamphetamine at the time of the drug crime charged. As explained above, however, it is not dispositive in this case that Smith did not know that the items prepared by Ray Garton and mailed by him contained false statements. Rather, it is important that he reasonably anticipated the use of the mails in furtherance of the fraud that he admitted that he knew was being worked on investors.

## III. Conclusion

None of the *Bashara* factors support allowing Shaun Michael Smith to withdraw his plea, save the fact of his background and

inexperience with the criminal justice system, which militates ever so slightly in his favor. These factors are ultimately, however, outweighed by the strength of the arguments against him with respect to the other factors. Accordingly, the Court declines Smith's request to withdraw his guilty plea. Further, the Court sees no reason to vacate Smith's plea for it found and still finds an adequate factual basis for that plea as directed in Fed. R. Crim. P. 11(b)(3).

This the 17th day of May, 2011.



**Signed By:**

**_Joseph M. Hood_**

**Senior U.S. District Judge**